UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
ERWIN FERNANDO CALDERON, and
FELIPE RODRIGUEZ, on behalf of
themselves and all others similarly situated,

               Plaintiffs,                  **MEMORANDUM & ORDER**

     -against-                      14-CV-2616 (PKC)(RLM)

MULLARKEY REALTY, LLC, DENIS P.
MULLARKEY, LLC, and DENIS P.
MULLARKEY, in his individual and
professional capacities,

               Defendants.
--------------------------------------------------------X
PAMELA K. CHEN, United States District Judge:

      Plaintiffs Erwin Fernando Calderon ("Calderon") and Felipe Rodriguez ("Rodriguez")

bring this action against Defendants Mullarkey Realty, LLC, Denis P. Mullarkey, LLC

("Mullarkey LLC"), and Denis P. Mullarkey ("Mullarkey") for alleged violations of overtime,

minimum wage, and anti-retaliation laws under the Fair Labor Standards Act ("FLSA") and the

New York Labor Law ("NYLL") as well as for violations of the wage notice requirements under

the NYLL.  Before the Court are the parties' respective motions for partial summary judgment.

For the reasons stated below, Defendants' motions for summary judgment are granted in part and

denied in part. Plaintiffs' motion for summary judgment is denied in its entirety.

**A. Undisputed Facts[2]**

The parties only agree as to the most basic facts. Denis P. Mullarkey RE, LLC and Defendant Denis P. Mullarkey, LLC own two residential buildings in Queens, New York. (Defendants' 56.1 Response Statement ("Defs.' 56.1 Resp."), Dkt. 89, ¶¶ 1-2.) Defendant Denis P. Mullarkey is the owner and President of Mullarkey LLC. (*Id.* at ¶ 5.) His wife, Catherine Mullarkey, was an office worker for Mullarkey LLC processing payroll, but did not keep track of the employees' hours. (*Id.* at ¶¶ 8, 11.) Mullarkey LLC employed Plaintiff Calderon as a superintendent from August 1983 until 2013 (Plaintiffs' 56.1 Response Statement ("Pls.' 56.1 Resp."), Dkt. 93-1, ¶ 3) and Plaintiff Rodriguez as a general worker and, occasionally, as a porter, from approximately 2001 until October 2013 (*id.* at ¶ 4; Defs.' 56.1 Resp., ¶¶ 65, 81).

Calderon was the only person with the title of "superintendent" in the Defendants' two buildings. (Pls.' 56.1 Resp., ¶ 3.) The parties agree that his duties included: collecting rent; performing plumbing inside apartments; soldering and piping in the basement; handling blown fuses, electricity issues, and flooding; and dealing with people smoking or sitting by the premises. (*Id.* at ¶¶ 47-48.) Calderon referred to himself as the "superintendent" to tenants and contracted with tenants via "Superintendent Agreements" to perform repair work in their apartments. (*Id.* at ¶ 49.) He was also listed as the superintendent for the buildings on the New York City Department

---

[1] Because, as discussed *infra*, Defendants are not moving for summary judgment as to Rodriguez's minimum wage and overtime claims, this section does not include facts relating to Rodriguez's hours, pay, or job responsibilities.

[2] Unless otherwise noted, a standalone citation to a party's 56.1 Response Statement denotes that this Court has deemed the underlying factual allegation undisputed. Any citations to a party's 56.1 Response Statement incorporates by reference the documents cited therein. Where relevant, however, the Court may cite directly to the underlying document.

of Buildings registration and with the New York Fire Department.  (*Id.* at ¶ 50.)

For his entire employment, Calderon lived rent-free in an apartment in one of Defendants' buildings and was provided with free utilities.  He was the only employee to have such an arrangement.  (*Id.* at ¶ 39; Defs.' 56.1 Resp., ¶ 27.)[3]  From April 2008 through June or July 2013, his regularly scheduled hours were 8:30 a.m. through 5:00 p.m., with a one-hour lunch break, from Monday to Friday.  (Pls.' 56.1 Resp., ¶ 6.)  He was paid by check every week and was always the highest paid employee.  (Defs.' 56.1 Resp., ¶¶ 38-39; Pls.' 56.1 Resp., ¶ 38.)  Mullarkey never paid Calderon for more than 37.5 hours of work each week.  (Deposition of Denis Mullarkey ("Mullarkey Dep."), 108:2-4.)[4]

On November 15, 2013 (Defs.' 56.1 Resp., ¶ 52), Calderon received a letter from Defendants stating:

> Your employment with us officially ended on July 23, 2013.  We have held the position of Superintendent open from July to the present.  Since we have not received written notification from you as to when you will be able to perform the full time duties of Superintendent . . . we have no choice but to fill the position . . . effective immediately.

(Termination Letter, Dkt. 93-12).  The letter also stated that Calderon's apartment was "no longer under employee exempt status and [he would] be expected to pay rent if [he] cho[]se to reside [in] []his apartment" after December 1, 2013.  (*Id.*)

On July 30, 2013, Calderon applied to the New York State Workers' Compensation Board

---

[3] Although, based on Plaintiffs' 56.1 Response, this fact is undisputed, Mullarkey testified at his deposition that Rodriguez lived "some part of the time" rent-free "and there was another part of the time I recall I charged him a small amount just for the electricity."  (Mullarkey Dep., 53:4-10.)

[4] The parties have scattered excerpts from their depositions across many different exhibits. Excerpts from Denis P. Mullarkey's December 18, 2015 deposition can be found in Dkts. 82-4, 87-2, 90-4, 96-3, and will be referred to collectively as "Mullarkey Dep.".

for disability based on "osteoarthritis of both knees." (Board Panel Decision ("Board Dec."), Dkt. 82-8, at 1.) A hearing was held on June 5, 2014, during which Calderon testified that "July 22[, 2013] was [his] last day" at work. (Workers' Compensation Hearing ("Hearing Tr."), Dkt. 82-7, 5:19-20; *see also* Board Dec., at 2 ("The claimant stopped working on July 22, 2013, due to pain.").) His claim was initially denied on June 10, 2014 and the denial was affirmed on May 22, 2015. (Board Dec., at 1, 6.) In its opinion, the Board noted that Catherine Mullarkey testified at the hearing that Calderon "was terminated on November 15, 2013, because he was out on disability and they had to fill the position." (*Id.* at 3.)

During the course of Plaintiffs' employment, Defendants never spoke to an attorney regarding an employer's responsibilities under the state and federal minimum wage laws or about an employer's duty to provide wage statements each pay period under the NYLL. (Pls.' 56.1 Resp., ¶¶ 84-85.) However, Defendants did "have a – a big sign on – where the employees report to every day in the office – or outside the office showing all employees their rights and employers what they were supposed to pay." (Mullarkey Dep., 165:17-23.) Defendants did not have a timecard or punch card system to record hours. (*Id.* at 135:11-22; Deposition of Catherine Mullarkey ("C. Mullarkey Dep.")[5], 28:20-29:9.)

## B. Disputed Facts

### 1. Calderon's Work Schedule

From 1983 until 2003, Calderon's work schedule was 8:00 or 8:30 a.m. until 5:00 p.m., from Monday to Friday, with a one-hour lunch break.[6] (Mullarkey Dep., 23:5-20.) Although he

---

[5] Excerpts from Catherine Mullarkey's deposition can be found in Dkts. 82-23, 93-8, and 96-5, and will be referred to collectively as "C. Mullarkey Dep.".

[6] Catherine Mullarkey stated that she never checked to see whether Plaintiffs actually took a lunch break. (C. Mullarkey Dep., 27:11-28:6.)

was also on-call after hours, "[Mullarkey] did not force [him] to stay in the building" and Calderon never asked for compensation for being on-call "because when [the tenants] would call [him with a problem], the following day [he] would go and do the job." (Deposition of Erwin Calderon ("Calderon Dep."), 85:14-85:24, 115:6-15.)[7] According to Calderon, his work schedule changed dramatically in 2003[8] when he was told that: (1) his regular hours were 8:30 a.m. to 5:00 p.m., Monday through Friday; (2) he was on-call from 5:00 p.m. to 10:00 p.m., Monday through Friday; (3) he was on-call from 8:30 a.m. until 10:00 p.m. on Saturdays;[9] and (4) "[he] had to be on-call" for "24 hours" a day. (*Id.* at 29:3-19; *see id.* at 20:15-21:4 (Mullarkey allegedly "told [Calderon] that [his] regular hours were 8:30 [a.m.] to 10:00 [p.m.] at night and . . . told [Calderon] that [he] always ha[d] to be available 24 hours a day in case someone in the building need[ed] [him]").)

According to Calderon, Mullarkey "want[ed] [him] to be in the building, more or less" and and Calderon worried that if he left, he would be fired. (*Id.* at 88:17-19, 89:24-90:2, 116:14-117:11, 129:7-9, 149:2-10, 214:5-20.) If Calderon wanted to leave for any reason, he "would have to let [Mullarkey] know" and tell Mullarkey that Rodriguez was "going to be in charge and if anything happens, [Rodriguez] will be near the building." (*Id.* at 129:10-16, 145:3-16.)[10]

---

[7] Excerpts from Erwin Calderon's deposition can be found in Dkts. 82-5, 87-1, 90-5, 93-4, 93-5, and 96-2, and will be referred to collectively as "Calderon Dep.".

[8] Calderon's statements about when this increased work schedule began are somewhat conflicting. He alternately testified that the new schedule began in 2001 (Calderon Dep., 29:3-17), in 2003 (*id.* at 88:17-24, 129:17-20), in 2005 (*id.* at 151:17-23), and in 2007 (*id.* at 130:2-131:25, 134:11-15, 151:11-27). However, as explained *infra*, due to the statute of limitations, the exact year is ultimately irrelevant for purposes of calculating potential damages.

[9] Later in his deposition, Calderon stated that he was on-call from 8:00 a.m. to 10:00 p.m. on Saturdays. (Calderon Dep., 143:13-16.)

[10] Calderon testified that he would pay Rodriguez when he went out and left Rodriguez in charge. (Calderon Dep., 145:23-146:2.) Calderon also stated that he was never specifically prohibited by Mullarkey from walking a few blocks away from the building. (*Id.* at 171:8-13.)

Calderon was permitted to leave the buildings after 10:00 p.m., and between 5:00 p.m. and 10:00 p.m., Calderon says he could cook dinner, watch television, talk on the phone, go on the computer, play games, or "do whatever [he] wanted to do in the apartment." (*Id.* at 135:14-16, 138:3-139:15.) At 10:00 p.m., Calderon would either go to bed or "go watch TV or play chess with [his] son[.]" (*Id.* at 139:9-15, 146:17-19.) On Sundays, Calderon was not required to be in the buildings, but Mullarkey told him "just to make sure someone would be there in charge." (*Id.* at 147:10-14.) From "time-to-time", Calderon would contract with tenants via a "Superintendent Agreement" to perform repair work in their apartments on Sundays. (November 2016 Declaration of Erwin Calderon ("Nov. 2016 Calderon Decl."), Dkt. 93-2, ¶ 3.) However, Calderon alleges that even when he was not doing physical work, he was "watching the buildings the whole time and [he] was at the building the whole time like [Mullarkey] wanted [him] to [be]." (Calderon Dep., 191:10-12, 199:5-11.)

According to Mullarkey, he set Calderon's work schedule "[a]t the beginning" but "later on, Mr. Calderon then set his own work schedule." (Mullarkey Dep., 22:20-25.) Mullarkey conceded that Calderon was on-call on Saturday and Sunday, but stated that he was not required to stay in the buildings, that Mullarkey "did permit [Calderon] to leave either his home or worksite on Sundays[,]" and that "[Calderon] could leave . . . his worksite anytime after 5 o'clock." (*Id.* at 79:16-19, 89:4-17, 100:2-9.) Mullarkey said he visited the buildings twice a day, generally between 7:00 a.m. to 10:00 a.m. and 2:00 p.m. to 3:00 p.m., to "pick up various things, pick up rents, listen to what Mr. Calderon want[ed] to tell me" or get supplies. (*Id.* at 42:4-14, 43:21-25.) He would also occasionally visit the premises after 5:00 p.m. and "never" saw Calderon doing building work. (*Id.* at 67:12-68:10.) He did concede, however, that Calderon sometimes told him that he did work after hours, such as shutting down the water to an apartment because of a leak or

attending to a problem with the boiler. (*Id.* at 68:11-23.) Speaking about Calderon's work after

hours, Mullarkey stated, "if nothing goes on in the building, he does nothing. If something comes

up, he has to take care of it." (*Id.* at 80:16-22.) At his deposition, Mullarkey stated that Plaintiffs

"never asked" to be paid for certain hours. (*Id.* at 164:8-25.)

When asked for examples of physical work he had to do after 5:00 p.m. in both buildings,

Calderon described the following incidents:

- Fixing the boiler. According to Calderon, Mullarkey "sometimes . . . would himself call [Calderon] at 4:30 in the morning" because "the boiler would get stuck and there wouldn't be any hot water, he would call me and I would get it fixed." (Calderon Dep., 20:19-21:2.) When asked how often this occurred, Calderon stated Mullarkey would call him approximately "once a week" from October to May. (*Id.* at 249:2-25.) According to Calderon, fixing the boiler took "up to an hour and a half." (*Id.* at 120:17-23.) By contrast, Mullarkey argues that responding to the boiler "usually consisted of pushing a switch", that it never occurred before 5:30 a.m., and "did not even happen once a year." (November 2016 Declaration of Denis Mullarkey ("Nov. 2016 Mullarkey Decl."), ¶¶ 8, 13.)

- Removing people from the buildings' outside areas. Calderon testified that Mullarkey would call "at 7 in the morning" if he found someone sleeping outside the buildings "so [Calderon] would remove the person." (Calderon Dep., 94:7-12, 96:2-25, 100:5-18.) Calderon stated that the calls about this were "continuous. Because sometimes if it wasn't Mr. Mullarkey, the porter would come in early and he would see them and he would call me." (*Id.* at 94:17-23.) "[I]t didn't happen every day but it happened frequently. . . [p]robably once a week" and would take "[h]alf an hour, more or less" to resolve. (*Id.* at 95:2-8, 97:21-25.) By contrast, Mullarkey argues that he "was the person who ejected [the people sleeping or loitering] since Calderon did not start working until 8:30 a.m. In the event that Calderon ejected any such individuals, it only took a few minutes, and at most happened about three (3) or four (4) times a year. However, he never reported these instances to me." (Nov. 2016 Mullarkey Decl., ¶ 9.)

- Doing plumbing work inside the apartments during the day and if he did not finish before 5:00 p.m., he would "stay later." (Calderon Dep., 18:5-14.) Calderon testified that afterwards he would "go down to the basement" and work on the buildings' lead abatement project, solder piping in the walls, and change pipes that leaked. (*Id.* at 59:25-60:5.) Calderon said that he would generally work on the lead abatement project "between 6 and 7 [p.m.] because at night, there was less traffic." (*Id.* at 136:22-137:6, 161:22-162:3,

188:17-189:2.) According to Mullarkey, however, the lead project concluded in 2011 and Calderon never worked on it after 5:00 p.m. (Mullarkey Dep., 239:2-9; *see also* Nov. 2016 Mullarkey Decl., ¶ 20.)

- Turning off the alarms on the roof when they went off. (Calderon Dep., 171:23-172:20, 180:7-181:2.) According to Calderon, it would take forty-five minutes to an hour to deal with the alarm and that it went off "[p]robably 20 [times] per year". (*Id.* at 179:15, 182:12-13.) According to Mullarkey, the exit alarms "rarely went off in the middle of the night (i.e. at most once or twice each year). When this happened[,] it only took about five (5) minutes for Calderon to go downstairs and turn a key to shut the alarm." (Nov. 2016 Mullarkey Decl., ¶ 16.)

- Shooing people out of the buildings' stairwells. (Calderon Dep., 172:2-5, 182:17-18:3.) According to Calderon, dispersing people would take about "half an hour" and this would generally happen "[m]aybe 25 times" per year over the last six years. (*Id.* at 183:7, 21-22.) Calderon said he would "[n]ormally" or "[p]robably all the time" tell Mullarkey when he removed people from the stairwell. (*Id.* at 186:13-15.)

- Checking the temperature in various apartments during the winter. (*Id.* at 172:7-172:20.) According to Mullarkey, "Calderon rarely had to check the temperature for one (1) tenant who lived on the floor below Calderon's apartment. This happened at most five (5) or six (6) times each winter, could have taken place during the day, only took a minute or two (2), and solely consisted of pushing a button on a gauge." (Nov. 2016 Mullarkey Decl., ¶ 15.)

- Responding to a robbery in the basement of one of the buildings at 3:00 a.m. (Calderon Dep., 102:8-22.) According to Mullarkey, the robbery occurred twenty-five years ago. (Nov. 2016 Mullarkey Decl., ¶ 10.)

- Fixing blown fuses in tenants' apartments. According to Calderon, a tenant would call him "once a week" and it would take him twenty minutes to change the fuse and explain to the tenant what had happened. Calderon also told Mullarkey that he "would have to go back to the apartment during the day to check the outlet." (Calderon Dep., 105:16-25, 108:10-11, 109:22-25.) Mullarkey denies that this occurred once a week, but "[o]n the rare occasion that it happened, if ever, Calderon generally addressed the issue the next day during his regular hours." (Nov. 2016 Mullarkey Decl., ¶ 11.)

- Collected rent and served tenants who were late on rent with legal documents. (Calderon Dep., 124:2-25, 312:20-25.) According to Mullarkey, he "personally served tenants with legal documents at the Building during daytime hours. In the event that [he] was unable to serve the documents, Calderon served the tenants with the documents during his

on-call hours. This happened approximately once every two (2) months, but only took a few minutes since Calderon only had to ring the tenant's doorbell and hand them the documents." (Nov. 2016 Mullarkey Decl., ¶ 14.)

- Shutting off pipes if there was a leak. (Calderon Dep., 258:10-21.) According to Mullarkey, this happened on "rare occasion", "if ever", and "the system was solely for Calderon to shut the water line off (which took a few minutes)" and go back to his apartment. (Nov. 2016 Mullarkey Decl., ¶ 12.)

In his declaration that was submitted with Defendants' summary judgment briefing, Mullarkey alleges that "[w]hen Calderon told me that he worked extra time or if I called him to address an issue . . ., which was rare, I directed him to take time off during his regular schedule so that he only worked thirty-seven and a half (37.5) hours for the week." (*Id.* at ¶ 18.) According to Calderon, he told Mullarkey "on a few occasions" that he should be paid overtime because he was being forced to stay in the buildings. (Calderon Dep., 131:3-13, 135:21-25, 150:12-18, 151:3-6, 156:3-17.) Calderon testified that he was sufficiently compensated for being on-call or occasionally performing work between 10:00 p.m. and 8:30 a.m. because he was "not paying for rent", but thought he should be compensated for his time on-call between 5:00 p.m. to 10:00 p.m. because "[i]f I am in the building, I am doing work. At 10 [p.m.] I go home. If I go out, I can go out." (*Id.* at 199:19-200:13; *see also id.* at 197:12-13.) At his deposition, Calderon stated that he "swallow[ed] it" regarding not being paid for his on-call time, "I just took it. What [Mullarkey] really wanted me to do is leave." (*Id.* at 154:12-13.) According to Calderon, when he asked for a raise, Mullarkey told Calderon that he "needed to be grateful that [he] had a job", and Calderon was "very mad because he was forcing me to work without pay." (*Id.* at 253:22-254:8; *see also id.* at 219:17-25.)

## 2. Calderon's Supervisory Authority

According to Defendants, from at least 2008 until the end of Calderon's employment, there were

four employees working in the buildings: (1) Calderon; (2) "someone in a janitorial . . . function";[11] (3) Rodriguez; and (4) Baltazar[12]. (Mullarkey Dep., 51:4-11.) Calderon concedes that there were at least three people, including himself, working for Defendants. (Calderon Dep., 76:13-16, 77:6-21, 213:13-17, 343:4-7.) Mullarkey testified that, as superintendent, Calderon "would practically run all aspects of the building." (Mullarkey Dep., 55:18-21.)[13] Mullarkey also stated that he would hire and fire "with recommendation from Mr. Calderon" unless "somebody was causing harm to the building or really getting us into a – a very tight situation", in which case Calderon could unilaterally fire the employee. (*Id.* at 194:20-195:11, 196:4-6.) Mullarkey testified that: "I didn't go out and hire any of the employees. Mr. Calderon brought them in to recommend them that they be hired." (*Id.* at 194:24-195:3.) In fact, according to Mullarkey, Rodriguez got his position "through Mr. Calderon's recommendation." (*Id.* at 21:2-5.) At the same time, however, Mullarkey conceded that he was "the only person with authority to terminate either Mr. Calderon or Mr. Rodriguez[.]" (*Id.* at 34:2-5.)

According to Mullarkey, he only communicated with Rodriguez through Calderon, and Rodriguez never reported to him. (*Id.* at 22:5-7, 34:6-11, 193:18-22.) However, Mullarkey acknowledged that he made the disciplinary decisions and then told Calderon what to relay to Rodriguez. (*Id.* at 41:13-16.) Mullarkey also stated that he did not direct Calderon as to what he

---

[11] According to Mullarkey, two people filled the janitorial position, "a Hector and a Juan." Juan never lived in Defendants' buildings, but Hector lived there and paid rent. (Mullarkey Dep., 53:25-54:13.) According to Calderon, there were also individuals named "Vincente" and "Carlos" who worked for Defendants as janitors between 2010 and 2013. (Nov. 2016 Calderon Decl., ¶¶ 12-13.)

[12] Baltazar, whose first name is not indicated in the record, replaced Calderon as the superintendent after Calderon's termination. (Mullarkey Dep., 53:16-23.)

[13] According to Mullarkey, Calderon would also suggest to Mullarkey "about what [they] need[ed]" for the buildings. (Mullarkey Dep., 58:13-25, 59:17-19.)

wanted Rodriguez to work on—that was "always" Calderon's decision—although Calderon sometimes asked Mullarkey for "the okay" to have Rodriguez do a particular task. (*Id.* at 36:5-19.) However, Mullarkey also stated that he set Rodriguez's schedule as 8:00 a.m. to 5:00 p.m. and was the one who decided whether Rodriguez needed to work on the weekends based on the work required at a given moment. (*Id.* at 25:10-27:6, 35:2-15; *but see id.* at 27:7-22.) According to both Mullarkey and Rodriguez, Calderon kept track of Rodriguez's sick days, time off, and overtime hours. (*Id.* at 39:11-16, 138:3-12; Deposition of Felipe Rodriguez ("Rodriguez Dep.")[14], 59:6-60:4.) Mullarkey also testified that Calderon supervised Baltazar, the full-time handyman. (Mullarkey Dep., 75:21-24, 76:21-23, 77:7-8.)

In his deposition, Calderon denied having input in firing or maintaining employee personnel files, but acknowledged that he suggested people for hiring, even though interviewing "was Mr. Mullarkey's job." (Calderon Dep., 79:4-18, 81:6-12, 343:17-344:18, 346:25-347:4; *see also* Nov. 2016 Calderon Decl., ¶¶ 5-7, 15-16.) Calderon also denied setting employee schedules, although he testified that he wrote them out for the employees because "Mr. Denis [Mullarkey] told me what each one should do from this hour to that hour and the only thing that I did was write it so they would have it in writing." (Calderon Dep., 80:20-81:2.) Calderon did concede to being able to reprimand the other employees "because sometimes Mr. Mullarkey would find that a floor was dirty or it wasn't cleaned correctly." (*Id.* at 79:19-80:15.) Calderon also conceded that "the chain of command look[ed] something like this: Denis Mullarkey is at the top. Then [Calderon] below him as the super and then the two porters are below [Calderon.]" (*Id.* at 78:8-13, 213:18-214:9.)

---

[14] Excerpts from Rodriguez's deposition can be found in Dkts. 82-6, 90-6, 93-9, and 96-6, and will be referred to collectively as "Rodriguez Dep.".

### 3. Calderon's Termination

According to Mullarkey, Calderon stopped working for him in July 2013 after Calderon filed for disability.  According to Calderon, Mullarkey told him on June 22, 2013 that "[Mullarkey] no longer had any more work for [him]", but still "made [Calderon] from June until November 15 to go down and do work[.]"  (*Id.* at 18:17-18, 24-25.)  However, Calderon also testified in his deposition and at the Workers' Compensation Board hearing that the last day he worked for Mullarkey was July 22, 2013.  (*Id.* at 65:2-10, 68:19-21, 69:15-25.)  Mullarkey stated during his deposition that he and Calderon agreed that even though Calderon officially stopped working in July 2013, he would allow Calderon to do some work in the office because "the guy's been . . . with me for 30 years.  I just can't throw a guy out."  (Mullarkey Dep., 160:9-161:3.)  In exchange, "[t]here'd be no wage.  There would [continue to be] a free apartment, free cable he would get, and that was–and that was it.  And it was up to him whether he wanted it or not, and he agreed to it."  (*Id.* at 161:8-13, 162:23-163:6; *see also* Calderon Dep., 158:6-160:8, 272:3-20 ("Q: And he said look, if you come do some paperwork for an hour or two each day in the basement [after July 2013], I'm not going to charge you rent, correct? A: That's what I understood, but it was not explained to me in this manner.").)  Calderon worked in this capacity until November 15, 2013.  (Calderon Dep., 18:24-19:9.)  Calderon kept a list of hours that he worked during most of the July 2013 to November 2013 period.  (*Id.* at 276:21-277:6; *see also* Dkt. 96-11.)  According to Calderon, Mullarkey fired him when he saw that Calderon "was putting the hours together and he got angry and then on November 15[, 2013], he terminated me. . . .  He told me he wanted the rent on December 1st.  This entire time, I had no pay.  Because I was afraid to go out on the street with my children.  I had no place to go."  (Calderon Dep., 18:24-19:9, 277:12-21.)

## C. Procedural History

On April 24, 2014, Plaintiffs commenced the instant action. (Dkt. 1.) On July 15, 2014, Defendant Mullarkey LLC filed a complaint in New York Supreme Court, Queens County against Calderon alleging breach of fiduciary duty, breach of the duty of loyalty, the faithless servant doctrine, tortious interference with prospective economic advantage, and tortious interference with business relations. (State Court Complaint ("State Compl."), Dkt. 82-10.) In response, on November 3, 2014, Plaintiffs filed an amended complaint in this action to add claims of retaliation under the FLSA and NYLL. (Amended Complaint ("Am. Compl."), Dkt. 24, ¶¶ 81-90.)

The allegations underlying the state court action were that, during the entire course of Calderon's employment, he "on numerous occasions intentionally, improperly and wrongfully requested and received 'key money' [bribes] from potential tenants and/or current tenants seeking to switch apartments within the premises, without authorization or knowledge of Mullarkey LLC." (State Compl., ¶¶ 6-7.) Only the faithless servant and breach of duty of loyalty claims ultimately went to the jury. In charging the jury, the trial judge instructed,

> If you find that defendant breached his duty of loyalty you must then determine the date of the first disloyal act. Next, you must determine the amount of compensation defendant received from [Mullarkey LLC] from that date to the last date of his employment. Those items include the total salary he received, as well as any other forms of compensation.

(Pls.' Supplemental Counter-Statement of Undisputed Facts ("Pls.' Supp. 56.1 Resp."), Dkt. 109-1, ¶ 8.) On May 26, 2017, the jury returned a verdict for Mullarkey LLC, finding that Calderon had breached his duty of loyalty as a "faithless servant" by collecting "key money" from tenants. (*Id.* at ¶ 11.) During deliberations, the jury submitted a note stating that they determined 1988 to be the year Calderon first breached his duty of loyalty, but that they could not calculate Calderon's compensation from 1988 to 2008 because there was no documentation regarding his compensation

during those years. The jury ultimately awarded damages in the amount of $276,044.98, including repayment of "key money" to the tenants and the disgorgement of all compensation paid by Mullarkey LLC to Calderon from the date of his breach of duty of loyalty to the last date of his employment. (*Id.* at ¶¶ 10-12; Dkts. 106-5, 106-7.)

After the close of discovery in this action, the parties appeared for a pre-motion conference concerning the parties' requests to file motions for partial summary judgment. With the Court's leave, on December 15, 2016, the parties filed their respective motions for summary judgment. (Dkts. 78, 81.) On September 29, 2017, Defendants filed a supplemental motion for summary judgment based on the outcome of the state court action brought by Mullarkey LLC against Calderon. (Dkt. 104.)

## DISCUSSION

In this action, Plaintiffs assert claims for: (1) unpaid overtime under the FLSA and NYLL; (2) minimum wage violations under the FLSA and NYLL; and (3) failure to furnish proper wage statements under the NYLL. Calderon individually asserts claims for retaliation under the FLSA and NYLL. Defendants move for summary judgment against Calderon on all counts. Calderon moves for summary judgment on his FLSA unpaid overtime claim. Both parties move for summary judgment on the NYLL wage statements claim. Plaintiffs also move to bar Defendants from asserting an affirmative defense of "good faith" under the FLSA and NYLL. Finally, Defendants move to bar Plaintiffs from seeking damages for hours that they allege were not reported to Mullarkey and move to bar Calderon from claiming damages after July 2013. As noted earlier, Defendants are *not* moving for summary judgment as to Rodriguez on his FLSA and NYLL wage claims, except to the extent that Defendants seek to bar Plaintiffs from seeking damages for allegedly unreported hours, and to dismiss Plaintiffs' NYLL wage statements claim.

## I.     Preclusive Effect of the State Court Judgment (Counts 1-4)

As an initial matter, Defendants argue that Calderon should be barred from asserting his FLSA and NYLL overtime and minimum wage claims because he was found to be a "faithless servant" under New York law. (Dkt. 104.)  Defendants' motion for summary judgment is granted to the extent that Calderon seeks compensatory damages and denied to the extent he seeks liquidated damages and pre-judgment interest.

Under New York law, an agent is obligated "to be loyal to his employer and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties." *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003) (citation and internal quotation marks omitted).  "[A] faithless employee forfeits the right to compensation, at least for services that are tainted by the dishonesty and perhaps more broadly." *Henry v. Concord Limousine, Inc.*, No. 13-CV-0494 (JS)(WDW), 2014 WL 297303, at *6 (E.D.N.Y. Jan. 24, 2014) (citation omitted).  While courts in this Circuit have found that the faithless servant doctrine "does give rise to a partial defense on a theory of recoupment or setoff" where it is being raised as a compulsory counterclaim to a FLSA action, *id; see also Markbreiter v. Barry L. Feinberg, M.D., P.C.*, No. 09-CV-5573 (LAK), 2010 WL 334887, at *2 (S.D.N.Y. Jan. 29, 2010) ("[E]ven if [a faithless servant] claim is not an 'affirmative defense' in the sense that it is an independent bar to plaintiff's recovery, a matter I need not now decide, it does give rise to a partial defense on a theory of recoupment or setoff."),[15] the issue of whether a *prior* finding of faithlessness constitutes a "complete bar" to

---

[15] *See also Foley v. Am. Elec. Power*, 425 F. Supp. 2d 863, 873 (S.D. Ohio 2006) (holding that a "Company may setoff against amounts payable to Plaintiff . . . for any time period in which the Company can prove Plaintiff was disloyal, pursuant to the 'faithless servant doctrine'"); *but see Martin v. PepsiAmericas, Inc.*, 628 F.3d 738, 740-41 (5th Cir. 2010) (reaffirming the Fifth Circuit's position generally disallowing an employer to obtain a set-off or credit in an action to

pending FLSA or NYLL unpaid wage claim is one of first impression.[16]

Defendants argue that because Calderon is required to disgorge all compensation under the state court judgment, his unpaid wage claims are moot as Calderon is not entitled to any damages arising from his employment. (Defs.' Supplemental Br., Dkt. 104, at 5-6.) "A case becomes moot only when it is impossible for a court to grant 'any effectual relief . . . to the prevailing party.'" *Knox v. Serv. Employees Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (quoting *Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)). It is "settled [law] that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984); *see also Allen v. McCurry*, 449 U.S. 90 (1980); 28 U.S.C. § 1738. Under the state court judgment in this case, Calderon is obligated to disgorge "the amount of compensation [he] received from [the date of the first disloyal act] to the last date of his employment. Those items include the total salary he received, as well as any other forms of compensation." (Pls.' Supp. 56.1 Resp., ¶ 8.) Therefore, the Court finds that Calderon cannot recover any compensatory damages under the FLSA or NYLL, as any unpaid wages will be disgorged under the terms of the state court judgment. *See Zakresky v. Graduate Sch. of Figurative Art of New York Acad. of Arts*, 899 N.Y.S.2d 64, 64 (Sup. Ct. 2009) ("Here, the complaint alleges that [plaintiff] pled guilty to stealing

---

enforce the FLSA's minimum wage and overtime provisions) (collecting cases). In light of this case law, the Court rejects Plaintiff's argument that the FLSA preempts the faithless servant doctrine. (Pls.' Supplemental Br., Dkt. 109, at 9-13.)

[16] This case is distinguishable from *Torres v. Gristede's Operating Corp.*, 628 F.Supp.2d 447 (S.D.N.Y. 2008), in which the state law faithless servant counterclaims involved "distinct incidents [of sexual misconduct] . . . that were completely unrelated to defendant's compensation practices." *Chaluisan v. Simsmetal E. LLC*, 698 F. Supp. 2d 397, 406 (S.D.N.Y. 2010) (citing *Torres*, 628 F. Supp. 2d at 466, 468). Here, Calderon's state common law claims and FLSA claim "derive from a common nucleus of operative fact." *Id.* (quoting *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 335 (2d Cir. 2006)).

from the Academy during the period when he was serving as the Academy's comptroller. "Where, as here, [the employees] engaged in repeated acts of disloyalty, complete and permanent forfeiture of compensation, deferred or otherwise, is warranted under the faithless servant doctrine.'") (quoting *William Floyd Union Free Sch. Dist. v. Wright*, 877 N.Y.S.2d 359, 397 (2d Dep't 2009)); *see also Khaldei v. Kaspiev*, 135 F. Supp. 3d 70, 85-86 (S.D.N.Y. 2015) ("Where, as here, a [party] has engaged in multiple acts of disloyalty over a significant period of time—lasting not just months, but years . . . —forfeiture of any compensation owed during that time is clearly warranted.").

The issue then becomes: does Calderon still "have a concrete interest, however small, in the outcome of the litigation, [such that] the case is not moot"? *Knox*, 567 U.S. at 307-08; *see also Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990) ("Where on the face of the record it appears that the only concrete interest in the controversy has terminated, reasonable caution is needed to be sure that mooted litigation is not pressed forward, and unnecessary judicial pronouncements on even constitutional issues obtained, solely in order to obtain reimbursement of sunk costs."). In this case, there remains a question as to whether Calderon can still recover liquidated damages and pre-judgment interest under the FLSA and NYLL. Because the primary purposes of the liquidated damages provision of the FLSA and NYLL are to deter and punish the employer, rather than compensate the employee, the Court finds that he can.

Under the FLSA and NYLL, "an employer may be liable for liquidated damages 'in an additional equal amount' to the amount owed for 'unpaid minimum wages, or . . . unpaid overtime compensation.'" *Begum v. Ariba Discount, Inc.*, No. 12-CV-6620 (DLC), 2015 WL 223780, at *2 (S.D.N.Y. Jan. 16, 2015) (quoting 29 U.S.C. § 216(b)); *see also Barfield v. New York City Health and Hosps. Corp.*, 537 F.3d 132, 150 (2d Cir. 2008) (same). "But 'if the employer shows . . . that

the act or omission giving rise to [FLSA or NYLL liability] was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA or NYLL], the court may, in its sound discretion, award no liquidated damages or award [a lesser] amount thereof.'" *Begum*, 2015 WL 223780, at \*2 (quoting 29 U.S.C. § 260); *see also Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 47 (E.D.N.Y. 2015) (same). The Second Circuit "has characterized the employer's burden as 'a difficult one,' emphasizing that 'double damages [are] the norm and single damages the exception.'" *Barfield,* 537 F.3d at 150 (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999), *holding modified by Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61 (2d Cir. 2003)). In addition, under the FLSA and NYLL, a prevailing party may collect pre-judgment interest "to compensate a plaintiff for the loss of use of money." *Chandler v. Bombardier Capital Inc.*, 44 F.3d 80, 83 (2d Cir. 1994). However, under the FLSA, "[i]t is well settled that in an action for violations of the Fair Labor Standards Act prejudgment interest may not be awarded in addition to liquidated damages"; thus, a FLSA plaintiff may recover only one or the other. *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1065 (2d Cir. 1988) (per curiam).

There is an extremely limited body of case law addressing the impact of a finding under the faithless servant doctrine on a separate action for compensation. In *Khaldei*, the Southern District of New York found that the defendant could not maintain a counterclaim for a portion of plaintiff's royalties because "the record clearly demonstrate[d] that [the defendant was] a faithless servant" and that "[defendant's] misconduct clearly tainted the task for which he [sought] compensation, as Defendant's counterclaim for royalties seeks payment for his work involving the very same negatives that he wrongfully withheld." 135 F. Supp. 3d at 84, 86. In *Zakresky*, the New York Supreme Court granted defendant's motion to dismiss where plaintiff, a former

employee, previously pled guilty to charges of stealing from the defendant and then brought a separate action to recover the remaining salary under his contract. 899 N.Y.S.2d at 64. "The Court agrees with defendant that [plaintiff's] acts were faithless, as a matter of law, and that the extent of the faithless acts warrants forfeiture of the remainder of the salary which plaintiff seeks to recover." *Id.* In *William Floyd*, the New York Supreme Court granted a judgment to a school district, relieving it for ten years of its obligation to provide post-retirement insurance benefits to defendants, who were convicted of stealing from the school district. 61 A.D.3d at 856. On appeal, the Second Department not only found that the Supreme Court was correct to enter the judgment in plaintiff's favor, but also found that the lower court should not have "limit[ed] the defendants' forfeiture of insurance benefits to a period of 10 years. Where, as here, defendants engaged in repeated acts of disloyalty, complete and permanent forfeiture of compensation, deferred or otherwise, is warranted under the faithless servant doctrine." *Id.* at 859 (collecting cases). Finally, in *Matter of Blumenthal (Kingsford)*, the First Department affirmed the Surrogate Court's decision that, where respondent "made systematic, unauthorized transfers to himself" and others from his employer, "respondent, as a faithless servant, forfeited all salary and other compensation after his first faithless act. . . . In light of respondent's repeated disloyalty throughout his tenure, there is no merit to his assertion that there should have been an apportionment of his salary or of . . . commissions as to which disloyalty was not found." 822 N.Y.S.2d 27, 27 (1st Dep't 2006).

While the reasoning behind these decisions is persuasive, the Court concludes that it should not be applied to the liquidated damages provision of the FLSA or NYLL. Unlike compensatory damages, "liquidated damages under the [New York] Labor Law constitute a penalty to deter an employer's willful withholding of wages due." *Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253, 265 (2d Cir. 1999). And under the FLSA, while liquidated damages are not *per se* punitive, they

are "the norm" and available where a *defendant* fails to prove that its violations of the FLSA were in good faith. *Reich v. S. New England Telecommc'ns Corp.,* 121 F.3d 58, 71 (2d Cir. 1997); *see also Herman*, 172 F.3d at 142 (noting that liquidated damages are "not a penalty exacted by the law", but are "compensation to the employee occasioned by the delay in receiving wages due *caused by the employer's violation* of the FLSA" (emphasis added)). Additionally, while prejudgment interest is meant to compensate a plaintiff for "the loss of use of money that the plaintiff otherwise would have earned", it also "*discourages an employer* from attempting to 'enjoy an interest-free loan for as long as [it can] delay paying out back wages.'" *Chandler*, 44 F.3d at 83 (quoting *Clarke v. Frank*, 960 F.2d 1146, 1153-54 (2d Cir. 1992) (emphasis added)); *see also Donovan v. Sovereign Sec., Ltd.*, 726 F.2d 55, 58 (2d Cir. 1984) ("Pre-judgment interest also serves to remedy the competitive disadvantage inflicted on law-abiding businesses by denying the errant employer the free use of the money it should have paid out in wages. Failure to award interest would create an incentive to violate the FLSA [or NYLL], because violators in effect would enjoy an interest-free loan for as long as they could delay paying out back wages."). Thus, while a plaintiff in a FLSA or NYLL case should not be compensated for his faithlessness, neither should the defendant-employer be immune from liability for its potentially willful violations of federal and state law.

Such is the situation presented here. Unlike the faithless servant cases discussed above, the instant action involves two parties with potentially unclean hands. Plaintiff Calderon's FLSA and NYLL claims clearly arise out of the employment relationship, but they stem from Defendants' allegedly willful violations of federal and state law. Under the faithless servant doctrine, Calderon is not entitled to compensatory damages—regardless of Defendants' willful deprivation—because they would be compensating him for wages earned during his employment and are, therefore,

disgorgable.  At the same time, however, the Court finds that dismissing Plaintiff's liquidated damages and prejudgment interest claims would frustrate the deterrent and punitive purposes of the FLSA and NYLL with respect to employers' unlawful conduct.

Additionally, the Court is not convinced that permitting the liquidated damages and prejudgment interest claims to proceed would undermine the policy considerations underlying the faithless servant doctrine.  While the faithless servant doctrine "may imply a broad proposition, courts apply the rule relatively narrowly."  *Linder v. Innovative Commercial Sys. LLC*, 981 N.Y.S.2d 636, 636 (Sup. Ct. 2013), *aff'd,* 127 A.D.3d 670 (N.Y. App. Div. 2015).  Faithless servant claims are, "in essence, contract claims."  *Stanley v. Skowron*, 989 F. Supp. 2d 356, 360 (S.D.N.Y. 2013) (citation omitted).  In *Carco Group, Inc. v. Maconachy,* the Second Circuit held that:

> The faithless servant doctrine arises out of an agency or employment relationship, and New York courts have repeatedly and consistently used the rules and terminology of contract law in evaluating faithless servant claims. . . . Bearing in mind that the contract is one of employment and that the claims are that this defendant transgressed against the duties of loyalty inherent in the employer-employee relationship, it is clear that the controversy arises out of and relates to the contract which is the genesis of the relationship and the consequent duty. Similarly, this Court has described such claims as grounded in the law of agency, . . . a body of law in which [c]ontract law . . . defines many of the rights . . . and provides the remedies available for breach.

718 F.3d 72, 84-85 (2d Cir. 2013) (citations, internal quotation marks, and emphasis omitted); *see also Phansalkar*, 344 F.3d at 200 ("New York law with respect to disloyal or faithless performance of employment duties is grounded in the law of agency, and has developed for well over a century."); *Carco Grp., Inc. v. Maconachy*, 383 F. App'x 73, 76 (2d Cir. 2010) (same).  In contract law, "[t]he ultimate goal underlying . . . recovery is to make the injured party whole. . . . [A party] is made whole once he is placed in the same economic position he would have occupied but for [the other party's] breach."  *Adams v. Lindblad Travel, Inc*., 730 F.2d 89, 94 (2d Cir. 1984).

Allowing Calderon to recover liquidated damages and pre-judgment interest for Defendants' separate, potentially illegal behavior would not undermine the goal of making Defendants whole for Calderon's breach of the employment relationship. *See Feiger v. Iral Jewelry, Ltd.*, 41 N.Y.2d 928, 928 (1977) ("One who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary."). Thus, the Court finds that the state court jury's faithless servant finding against Calderon does not bar his claims for liquidated damages and prejudgment interest under the FLSA and NYLL.[17]

Here, as discussed *infra*, there remain significant factual disputes about whether Defendants failed to pay Calderon compensation he was entitled to under the FLSA or NYLL and, whether Defendants' violation, if any, was done in good faith. Therefore, Defendants' motion for summary judgment on preclusion grounds, while granted as to Calderon's FLSA and NYLL claims for compensatory damages, is denied as to his FLSA and NYLL claims for liquidated damages and prejudgment interest.[18]

_____

[17] The bifurcation of any hypothetical award would be done post-trial because there would need to be a verdict as to how much unpaid compensation is due before liquidated damages and prejudgment interest can be assessed. "Under the FLSA [and NYLL], an employer may be liable for liquidated damages in an additional equal amount to the amount owed for unpaid minimum wages, or . . . unpaid overtime compensation." *Fermin*, 93 F. Supp. 3d at 47.

Calderon would also be entitled to post-judgment interest on any liquidated damages award. The Second Circuit has held that "an award of post-judgment interest is 'mandatory' and should be awarded at the statutory rate prescribed by 28 U.S.C. § 1961." *Leon v. Zita Chen*, No. 16-CV-480 (KAM)(PK), 2017 WL 1184149, at *10 (E.D.N.Y. Mar. 29, 2017) (citing *Schipani v. McLeod*, 541 F.3d 158 (2d Cir. 2008)).

[18] Defendants also argue that "[r]es judicata and collateral estoppel bar Calderon from relitigating the NYS jury verdict" with respect to the amount of compensation he is entitled to under the FLSA and NYLL, including for purposes of liquidated damages. (Defs.' Supplemental Br., Dkt. 104, at 6-10.) The Court rejects this argument. "Collateral estoppel, like the related doctrine of res judicata, has the dual purpose of protecting litigants from the burden of relitigating

## II.     Exempt Manager (Counts 1-4)

Defendants argue that Calderon cannot bring his FLSA and NYLL overtime or minimum

wage claims because he was exempt as a salaried manager.  (Defs.' Br., Dkt. 79, at 8-12.)  To

qualify for the executive exemption under the FLSA, an employee must be:

> (1) [c]ompensated on a salary basis at a rate not less than $455 per week . . . ; (2)
> [w]hose primary duty must be managing the enterprise in which the employee is
> employed or of a customarily recognized department or subdivision thereof; (3)
> [w]ho customarily and regularly direct the work of at least two or more employees;
> and (4) [w]ho has the authority to hire or fire other employees or whose suggestions
> and recommendations as to the hiring, firing, advancement, promotion or any other
> change of status of other employees must be given particular weight.

*Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 560 (2d Cir. 2012) (quoting 29 C.F.R. §

541.100(a)).  The NYLL applies the same exemption.  *Reiseck v. Universal Commc'ns of Miami,*

*Inc.*, 591 F.3d 101, 105 (2d Cir. 2010).  "The employer who invokes [any] exemption bears the

burden of establishing that the employee falls within the exemption," *Mullins v. City of New York*,

653 F.3d 104, 113 (2d Cir. 2011), and must prove every element of the claimed exemption, *Martin*

*v. Malcolm Pirnie, Inc.*, 949 F.2d 611, 614 (2d Cir. 1991).  Exemptions are difficult to prove

because the NYLL and "the FLSA [are] remedial law[s]," *Reiseck*, 591 F.3d at 104, and

"exemptions to the overtime pay requirement are narrowly construed against the employers

seeking to assert them[,]" *Bilyou v. Dutchess Beer Distributors, Inc.*, 300 F.3d 217, 222 (2d Cir.

---

an identical issue with the same party or his privy and of promoting judicial economy by preventing
needless litigation."  *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 & n.5 (1979).  The jury in
the state court action was only tasked with determining "the amount of compensation [Calderon]
*received* from [the first date of disloyalty] to the last date of his employment.  Those items include
the total salary he received, as well as any other forms of compensation."  (Pls.' Supp. 56.1 Resp.,
¶ 8 (emphasis added).)  The jury decided what Calderon was paid from 1988 to 2013, it did not
address the question of what he was *not* paid.  Calderon did not have "a full and fair opportunity
to litigate the issue" of his unpaid wages in the state court action; and, in fact, it would have been
in his best interests to *minimize* his claimed earnings given that he was facing disgorgement as a
penalty.  *Khandhar v. Elfenbein*, 943 F.2d 244, 247-249 (2d Cir. 1991).

2002) (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)).

Defendants' motion for summary judgment on exempt manager grounds is denied. With respect to prong one, there is a genuine dispute of material fact as to whether Calderon was paid on an hourly or salary basis. Even Mullarkey himself stated during his deposition that he paid Calderon "hourly" and conceded that he was "the only person who could decide how much Mr. Calderon would earn per hour[.]" (Mullarkey Dep., 24:18-25:3.) However, in a separate declaration, he stated that Calderon's weekly paystubs "indicated a set salary." (Nov. 2016 Mullarkey Decl., ¶ 22; *see also* C. Mullarkey Dep., 31:11-18; Pls.' 56.1 Resp., ¶ 38.) With respect to prongs two and three, courts have typically construed "customary and regularly" directing work as requiring an individual to supervise two or more full-time employees "at least seventy-five to eighty percent of the time." *Awan v. Durrani*, No. 14-CV-4562 (SIL), 2015 WL 4000139, at *6 (E.D.N.Y. July 1, 2015) (citation and internal quotation marks omitted) (collecting cases). Here, there exist genuine issues of material fact as to whether, as Defendants contend, Calderon managed Defendants' building service employees and whether they reported to him directly. Finally, with respect to prong four, there are genuine issues of material fact as to whether Calderon had authority to hire, fire, or discipline other employees, or whether he made recommendations relating to hiring and firing that Defendants accorded particular weight.

### III.    Janitor Exemption (Counts 3 & 4)

Defendants argue that Calderon cannot sustain his NYLL wage and overtime claims because he was an exempt janitor. (Defs.' Br., at 12-16.) Pursuant to the NYLL, an employer may designate an employee as an exempt janitor. The Building Service Order defines a "janitor" as "a person employed to render any physical service in connection with the maintenance, care or operation of a residential building. Where there is only one employee, such employee shall be

deemed the janitor. Where there is more than one employee in the building, the employer shall designate an employee who lives in the building as the janitor. No building may have more than one janitor." 12 NYCCRR § 141-3.4. Courts employ a multi-factor test to determine whether a reasonable jury would necessarily find that a plaintiff was a "designated janitor" including: "(i) whether plaintiff was the only employee who lived in the building; (ii) the manner in which plaintiff and other employees were compensated; (iii) whether plaintiff was listed as a 'janitor' or 'superintendent' in the employer's official business records; (iv) whether plaintiff received written notice that he would be compensated as a building janitor; and (v) whether plaintiff or his employer represented to third parties that plaintiff was the 'janitor' or 'superintendent.'" *Almonte v. 437 Morris Park, LLC*, No. 14-CV-5951 (KPF), 2015 WL 7460019, at *5 (S.D.N.Y. Nov. 24, 2015).

Here, there remain genuine disputes of material fact as to whether Calderon was the janitor for Defendants' buildings. First, a reasonable jury could find that Calderon was not the only employee who lived in Defendants' buildings. While Calderon was the only employee to live rent-free in Defendants' buildings (Pls.' 56.1 Resp., ¶ 39; Defs.' 56.1 Resp., ¶ 27), by Defendants' own admission, there were other employees who lived in the building. Mullarkey testified at his deposition that Rodriguez lived in the buildings "some part of the time." (Mullarkey Dep., 53:4-10.) He also stated that "Hector" lives there and pays rent. (*Id.* at 54:10-16.) According to Calderon, other employees, including Baltazar, also lived in the buildings at various times. (Nov. 2016 Calderon Decl., ¶¶ 4, 13, 17.) As the court found in *Almonte*, there is "no support for [the] position" that Calderon was "the only employee who was eligible to be the janitor because [he] was the employee who live[d] in the building as an incident of his employment." 2015 WL 7460019, at *6 & n.5 (citation and internal quotation marks omitted). Therefore, this factor does not necessarily weigh in Defendants' favor in finding that Calderon was an exempt janitor.

Second, there is a genuine dispute of material fact as to whether Calderon was compensated as a janitor. In *Koljenovic v. Marx*, this court found that the plaintiffs were "compensated consistent with the regulations for resident janitors" where "they were provided with a flat salary, a rent-free apartment, and free utilities." 999 F. Supp. 2d 396, 400 (E.D.N.Y. 2014). While the parties agree here that Calderon was provided a rent-free apartment and utilities, one of the most hotly disputed issues in this case is whether Calderon was a salaried or hourly employee.

As to the third and fifth prongs, Calderon was listed as a "superintendent" in the employer's official business records and was represented to third parties as a "superintendent." *See Koljenovic*, 999 F. Supp. 2d at 400 (explaining that, "in the common parlance of New York City", the word "superintendent" refers to "a resident janitor") (citations omitted). Calderon referred to himself as the "superintendent" to tenants and contracted with tenants via "Superintendent Agreements" to perform repair work in their apartments. (Pls.' 56.1 Resp., ¶ 49.) He was also listed as the superintendent for the buildings on the New York City Department of Buildings registration and with the New York Fire Department. (*Id.* at ¶ 50.) However, in his deposition, Mullarkey identified a separate janitorial position that was filled by "Hector" and "Juan".[19] With respect to the fourth prong, there is no evidence as to whether Plaintiff received written notice that he would be compensated as a building janitor.

Considering all of the relevant factors, a reasonable jury could conclude that Defendants did not treat or compensate Calderon as a superintendent or the janitor. For that reason, Defendants are not entitled to summary judgment on Plaintiff's overtime and minimum wage claims under the NYLL on the basis of the janitor exemption.

---

[19] Relevant to the second prong, the evidence suggests that Calderon was compensated differently than "Hector" and "Juan", whom Mullarkey identified as janitors. (*See* Mullarkey Dep., 53:25-54:4.)

## IV. Minimum Wage Claims

### A. FLSA (Count 2)

Under Section 206 of the FLSA, "[t]o establish liability on a claim for underpayment of wages, 'a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work.'" *Salinas v. Starjem Rest. Corp.*, 123 F. Supp. 3d 442, 472 (S.D.N.Y. 2015) (quoting *Kuebel v. Black & Decker, Inc.*, 643 F.3d 352, 361 (2d Cir. 2011)); 29 U.S.C. § 206(a). "In particular, an employee must be paid at least minimum wage." *Salinas*, 123 F. Supp. 3d at 361 (citing 29 U.S.C. § 206(a)). To determine whether an employee was compensated above the required federal minimum wage, the Court must calculate the employee's average hourly wage, which is calculated as follows: "the total wage paid . . . during any given week is divided by the total time [the employee] worked that week." *United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 490 (2d Cir. 1960); *see also Thind v. Healthfirst Mgmt. Servs., LLC*, 14-CV-9539 (LGS), 2015 WL 4554252, at *4 (S.D.N.Y. July 29, 2015) (citation and internal quotation marks omitted). Assuming a three-year statute of limitations period under the FLSA, the Court considers Calderon's claim from April 24, 2011 until November 15, 2013. *See Apolinar v. Glob. Deli & Grocery, Inc.*, No. 12-CV-3446 (RJD)(VMS), 2013 WL 5408122, at *8 (E.D.N.Y. Sept. 25, 2013). The federal minimum wage for the period in question was $7.25 per hour. 29 U.S.C. § 206(a)(1)(C); *Armata v. Unique Cleaning Servs., LLC*, No. 13-CV-3625 (DLI)(RER), 2015 WL 12645527, at *6 n.5 (E.D.N.Y. Aug. 27, 2015). Therefore, to state a claim under Section 206 of the FLSA, Calderon must prove that the total amount he was paid in a given week, divided by the number of hours he worked in a given week, was less than $7.25 per hour.

Assuming *arguendo* that Calderon was a non-exempt employee and that the Court adopts

Plaintiffs' position that Defendants' wage records are inaccurate, there is still no genuine dispute as to any material fact such that a reasonable jury could find in Calderon's favor for the period from April 24, 2011 until July 22, 2013. *Gunawan v. Sake Sushi Rest.*, 897 F. Supp. 2d 76, 88 (E.D.N.Y. 2012) ("[W]hen an employer fails to maintain accurate records . . . courts have held that the plaintiff['s] recollection and estimates of hours worked are presumed to be correct." (internal quotation marks omitted)).  Although Calderon seeks compensation for working "24/7", as discussed *infra*, Calderon is only entitled to claim compensation for the period from 8:30 a.m. to 10:00 p.m., Monday to Saturday—totaling 81 hours per week—as well as the hours he allegedly worked during the period from 10 p.m. to 8:30 a.m. each day—totaling 4.83 hours per week.[20] Additionally, Calderon states that he was paid $23.58 per hour in 2011, $23.83 per hour in 2012, and $24.08 in 2013 for 37.5 hours of work each week.  (Pls.' 56.1 Resp., ¶¶ 27-29; Pls.' Br., Dkt. 93, at 7 ("[T]he undisputed documentary evidence shows that in 2008, Defendants paid Calderon an hourly rate of $22.83. This hourly rate increased by 25-cents every year.").)  Using Calderon's stated hourly wage, he was paid $884.25 per week in 2011, $893.62 per week in 2012, and $903.00 per week in 2013.  According to Defendants, Calderon was paid $853.12 per week in 2011, $878.12 per week in 2012, and $903.12 per week in 2013.  (Defs.' Br., at 9.)

Even using Defendants' lower weekly wage calculations, Calderon cannot sustain his

---

[20] As discussed *supra*, Plaintiff claims that, at a maximum, he spent one-and-a-half hours fixing the boiler, one hour doing plumbing, one hour turning off alarms, thirty minutes shooing people out of the stairwell, thirty minutes removing people from outside of the buildings, and twenty minutes fixing blown fuses in a given week between 10:00 p.m. and 8:30 a.m.  Calderon does not indicate how long he spent checking the temperature inside tenants' apartments, collecting rent and serving tenants, and shutting off pipes if there was a leak.  Therefore, this work cannot be factored in for purposes of Plaintiff's minimum wage claim.  This is ultimately irrelevant, however, because these activities would have to have taken more than thirty-one hours each week in order for Plaintiff to state a viable minimum wage claim, and there is no evidence in the record that these activities meet this threshold.

FLSA minimum wage claim for the period from April 24, 2011 until July 22, 2013. Using Defendants' weekly wage statements and Plaintiff's allegation that he worked 85.83 hours per week, Plaintiff's hourly wage was $9.94 in 2011, $10.23 in 2012, and $10.52 in 2013, all of which are greater than $7.25 per hour. Plaintiff's own evidence, therefore, fails to establish a genuine dispute of material fact as to whether he was paid at least minimum wage for all hours he worked up to July 22, 2013. The record shows that he was. In sum, there is not a "scintilla" of evidence, *Hayut*, 352 F.3d at 743, on which "a fair-minded jury could return a verdict for [him]," *Anderson*, 477 U.S. at 252.

However, for the period from July 23 to November 15, 2013, there is a genuine dispute of material fact as to whether Calderon was still employed by Defendants and whether he is owed wages for that period. *See infra* Section V(B). Because Defendants admit that Calderon continued to work in exchange for continuing to live rent-free in his apartment between July 2013 and November 2013, Calderon's claim for unpaid wages for that period survives summary judgment. *See id.*; *see also* 29 U.S.C. § 203(m) (FLSA regulations regarding lodging as a form of compensation). However, as discussed *supra*, due to the state court judgment against Plaintiff, Defendants' motion for summary judgment is granted as to Calderon's FLSA minimum wage claim for compensatory damages, but is denied as to his claim for liquidated damages and prejudgment interest.

### B. NYLL Minimum Wage Claim (Count 4)

As stated above, Calderon's FLSA minimum wage claim is dismissed with the exception of the period from July 23, 2013 to November 15, 2013. The NYLL "mirrors the FLSA in compensation provisions regarding minimum hourly wages and overtime[,]" *Santillan v. Henao*, 822 F. Supp. 2d 284, 292-93 (E.D.N.Y. 2011); however, "under state law, the limitations period

is six years", *Apolinar*, 2013 WL 5408122, at *6. Since the Court has already considered the period from April 24, 2011 until November 15, 2013, the Court will now consider whether Plaintiff was paid minimum wage between April 24, 2008 and April 23, 2011. As relevant here, "the minimum hourly wage in New York was $7.15 until July 24, 2009, the effective date the rate increased to $7.25." *Armata*, 2015 WL 12645527, at *6.

Calderon states that he was paid $22.83 per hour in 2008, $23.08 per hour in 2009, $23.33 in 2010, and $23.58 per hour in 2011 for 37.5 hours of work each week. (Pls.' 56.1 Resp., ¶¶ 24-27; Pls.' Br., at 7.) Using Calderon's stated hourly wage, he was paid $856.12 per week in 2008, $865.50 per week in 2009, $874.87 per week in 2010, and $884.25 per week in 2011. According to Defendants, Plaintiff was paid $778.12 per week in 2008, $803.12 in 2009 and 2010, and $853.12 in 2011. (Defs.' Br., at 9; Am. Compl., ¶¶ 40-43.) Using Defendants' weekly wage statements and Calderon's allegations that he worked 85.83 hours per week, Plaintiff's hourly rate was $9.06 in 2008, $9.35 in 2009 and 2010, and $9.94 in 2011, all of which are greater than $7.15 and $7.25 per hour. Therefore, the Court grants Defendants' motion for partial summary judgment as to Calderon's NYLL minimum wage claim from April 11, 2008 until July 22, 2013, but, for the reasons discussed *supra*, denies it as to his claim for liquidated damages and prejudgment interest for the period from July 23, 2013 to November 15, 2013.

## V.    NYLL Wage Statements (Count 5)

NYLL § 195(3) requires employers to "furnish each employee with a statement with every payment of wages," listing the following information:

> the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; and net wages.

*Ayala v. Looks Great Servs., Inc.*, No. 14-CV-6035 (ADS)(SIL), 2016 WL 3541548, at *2-3 (E.D.N.Y. June 23, 2016) (quoting NYLL § 195(3)). Statements provided to employees "who are not exempt from overtime compensation . . . must also include the 'regular hourly rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked.'" *Id.* at *3 (quoting NYLL § 195(3)). Prior to 2010, "employees did not have a private cause of action for an employer's failure to provide a proper wage statement under NYLL § 195(3). However, in 2010, the New York Legislature passed the Wage Theft Prevention Act (the 'WTPA') 'in an effort to expand the rights of employees to seek civil and criminal avenues of remedy' against their employers who fail to comply with the labor law.'" *Id.* (quoting *Copper v. Cavalry Staffing, LLC*, 132 F. Supp. 3d 460, 466 (E.D.N.Y. 2015)). An employee "may not recover for wage statement violations that occurred before April 9, 2011[,]" *Canelas v. A'Mangiare Inc.*, No. 13-CV-3630 (VB), 2015 WL 2330476, at *5 (S.D.N.Y. May 14, 2015), but "[e]mployee[s] who do not receive a copy of this written statement . . . with each payment of wages made on or after April 9, 2011 may recover one hundred dollars in damages for each week that the violation occurs, up to a statutory maximum of $2,500[,]" *Guaman v. Krill Contracting, Inc.,* No. 14-CV-4242 (FB)(RER), 2015 WL 3620364, at *9 (E.D.N.Y. June 9, 2015) (citing NYLL § 198(1–d)). Both parties move for summary judgment on this claim.

While Defendants acknowledge that they did not comply with the formal wage statement requirements under the WTPA, they assert that they properly paid Plaintiffs' wages, which "is an affirmative defense to claims under NYLL § 195(3)." (Defs.' Opp. Br., Dkt. 88, at 21 (citing NYLL § 198(1–d)).). Defendants are correct that "[i]n order to establish the defendants' liability, the plaintiffs must (1) establish that the wage statements the defendants provided did not satisfy the requirements under NYLL § 195(3), and (2) overcome the defendants affirmative defense that

they made 'complete and timely payment of all wages due.'" *Guan Ming Lin v. Benihana New York Corp.*, No. 10-CV-1335 (RA)(JCF), 2012 WL 7620734, at *10 (S.D.N.Y. Oct. 23, 2012) (quoting NYLL § 198(1–d)), *report and recommendation adopted*, No. 10-CV-1335 (RA)(JCF), 2013 WL 829098 (S.D.N.Y. Feb. 27, 2013). While it is undisputed that the first element is satisfied in Plaintiffs' favor,[21] there remain disputed issues of fact as to whether Defendants have made complete and timely payment of all wages due. Therefore, the parties' motions for summary judgment as to this claim are denied.[22]

## VI.    FLSA Retaliation (Count 6) and NYLL Retaliation (Count 7) Claims

To establish a claim for retaliation under the FLSA and NYLL, courts apply the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[23] *Mullins v. City of New York,* 626 F.3d 47, 53 (2d Cir. 2010). Accordingly, a plaintiff alleging retaliation "must first establish a prima facie case of retaliation by showing (1) participation in protected activity known to the defendant, like the filing of a FLSA [or NYLL] lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Id.* Once a prima facie case has been established, "the burden shifts to the defendant to articulate a legitimate,

---

[21] Accordingly, at trial, Defendants will be precluded from arguing or offering evidence to show that Defendants provided Plaintiffs wage statements that satisfied the WTPA.

[22] The Court finds that Calderon may recover statutory damages for violations of the WTPA because the statutory damages are not "compensation" owed to Plaintiff, but are meant to "dramatically increase the penalties against employers in order to far better protect workers' rights and interests." *Copper*, 132 F. Supp. 3d at 468 (citation and internal quotation marks omitted).

[23] NYLL § 215(1) and the FLSA's 29 U.S.C. § 215(a)(3) are "nearly identical" provisions. *Perez v. Jasper Trading, Inc.*, No. 05-CV-1725 (ILG), 2007 WL 4441062, at *7 (E.D.N.Y. Dec. 17, 2007) (finding it acceptable to rely on cases analyzing FLSA retaliation claim when adjudicating similar claims under the NYLL); *see also Torres*, 628 F. Supp. 2d at 471 n.18 (same).

nondiscriminatory reason for the [adverse] employment action. If the defendant meets this burden, the plaintiff must produce sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the [adverse] employment action." *Id.* at 53-54 (citation and internal quotation marks omitted).

In this case, Calderon argues that Defendants' July 2014 state court action was retaliation for Plaintiffs' April 2014 federal wage suit. (Am. Compl., ¶¶ 81-90.) While it is undisputed that Calderon engaged in a protected activity by filing his lawsuit, he has failed to demonstrate that he was subject to an adverse employment action. "The scope of post-employment conduct that does not have a direct connection to the former employee's employment prospects that has been recognized in this Circuit as potential unlawful retaliation under FLSA [and NYLL] is . . . relatively narrow. Courts have held that . . . instituting bad faith litigation against the employee constitutes actionable retaliation." *Jian Zhong Li v. Oliver King Enterprises, Inc.*, No. 14-CV-9293 (VEC), 2015 WL 4643145, at *3 (S.D.N.Y. Aug. 4, 2015) (citing *Torres*, 628 F. Supp. 2d at 473) (collecting cases); *see also Dunn v. Sederakis*, 143 F. Supp. 3d 102, 114 (S.D.N.Y. 2015). However, in this case, Defendants' lawsuit against Calderon was indisputably meritorious and, furthermore, Plaintiff has presented no evidence that Defendants' lawsuit had any impact on his employment prospects or that Plaintiff even sought work after Defendants terminated him. Therefore, the Court grants Defendants' motion for summary judgment as to Calderon's FLSA and NYLL retaliation claims. *See Patel v. Lutheran Med. Ctr., Inc.*, 753 F. Supp. 1070, 1074 (E.D.N.Y. 1990) (holding that former employer's alleged tortious interference was not an adverse employment action because "the action had no impact on plaintiff's current employment situation. Neither was he undertaking efforts to find a new job, so the alleged act in no way hindered

prospective employment. . . . [A] claim of retaliation requires an impact on the plaintiff's ability to continue or procure employment.  The alleged tort had no such impact, and none is claimed").

## VII.    Good Faith Defense

Plaintiffs argue that Defendants' affirmative defenses of good faith should be stricken "because it is undisputed that Defendants failed to take any affirmative steps to attempt to comply with the FLSA and the NYLL as required by those statutes."  (Pls.' Br., at 16-17.)  Plaintiffs' motion for summary judgment as to good faith—an affirmative defense to liquidated damages under the FLSA and NYLL—is denied.  The Second Circuit "has characterized the employer's burden to prove good faith 'as a difficult one, emphasizing that double damages [are] the norm and single damages the exception.'"  *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 938 (S.D.N.Y. 2013) (quoting *Barfield,* 537 F.3d at 150).  "To establish the requisite subjective 'good faith,' an employer must show that it took 'active steps to ascertain the dictates of the FLSA [or NYLL] and then act to comply with them.'"  *Barfield*, 537 F.3d at 150 (quoting *Herman,* 172 F.3d at 142).  The Court is doubtful that Defendants can make this showing, but at this stage, viewing the evidence in the light most favorable to the defense, the Court cannot rule out that possibility.

## VIII.   Damages

### A.  Unreported Hours

Defendants assert that they were not on notice that Plaintiffs were doing overtime work and, therefore, Defendants cannot be liable under the FLSA and NYLL for those hours.  (Defs.' Br., at 23.)  "To establish liability under the FLSA [or NYLL] on a claim for unpaid overtime, a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work."  *Kuebel*, 643 F.3d at 361.

Defendants argue that Plaintiffs worked a set schedule and when Rodriguez worked extra hours, Calderon wrote them down, confirmed them with Rodriguez, and then submitted the document to Mullarkey so that Rodriguez would be paid overtime. Additionally, Defendants argue that since Calderon never submitted any documents concerning overtime, he "must be estopped from claiming that he is entitled to wages for hours he purposefully underreported." (Defs.' Br., at 24.) Defendants' motion for summary judgment on this ground is denied.

### 1. Plaintiff Rodriguez

Although Rodriguez concedes that Mullarkey relied on Calderon to keep track of Rodriguez's overtime hours, Rodriguez alleges that Defendants did not properly compensate him for the hours he reported to Calderon. (*See* Rodriguez Dep., 59:6-61:5, 63:19-64:24, 149:10-150:10.) Specifically, Rodriguez alleges that he was only paid for overtime at his regularly hourly rate, rather than at time and a half, as required under the FLSA and NYLL. *See* 29 U.S.C. § 207(a)(1); (Rodriguez Dep., 65:16-66:25, 74:15-25.) Rodriguez states that he told Mullarkey "about the overtime, that he needed to pay me overtime. [Mullarkey] said that he didn't pay overtime, that if I didn't like it, I could leave and he would find someone else." (Rodriguez Dep., 66:2-6, 88:6-8, 146:2-147:12.) However, Catherine Mullarkey stated that she did pay Rodriguez overtime, but labeled them as additional "regular hours." For example, if Rodriguez worked forty-four hours in a week, she would list it as "46 regular hours" instead of "40 regular hours" and "4 overtimes hours"—"[h]e worked 44, but we paid him [for 46 hours to equal] time and a half." (C. Mullarkey Dep., 35:10-36:9.) Therefore, there is a genuine dispute of material fact as to whether Defendants were on notice of Rodriguez's hours and whether he was paid appropriately for them.

### 2. Plaintiff Calderon

The Court also rejects Defendants' estoppel argument as to Calderon. As noted *supra*,

Calderon testified that he told Mullarkey "on a few occasions" that he should be paid overtime because he was being forced to stay in the building and be on-call. (Calderon Dep., 156:3-24.) Calderon also claims that he told Mullarkey when he worked after hours, but that he was not compensated for that time. Therefore, there is a genuine dispute of material fact as to whether Defendants were on notice of Calderon's overtime hours and whether he was paid appropriately for them.

However, there is also a question as to whether all of Calderon's on-call time is compensable. In the Second Circuit, "the trial judge [is] responsible for determining as a matter of law whether plaintiff's activities could potentially constitute 'work.'" *Holzapfel v. Town of Newburgh,* 145 F.3d 516, 521 (2d Cir. 1998), *cert. denied,* 525 U.S. 1055 (1998). The Second Circuit has defined "work" as "exertion or loss of an employee's time that is (1) controlled or required by an employer, (2) pursued necessarily and primarily for the employer's benefit, and (3) if performed outside the scheduled work time, an integral and indispensable part of the employee's principal activities." *Chao v. Gotham Registry, Inc.,* 514 F.3d 280, 285 (2d Cir. 2008). "The determination of what constitutes work is necessarily fact-bound." *Reich*, 121 F.3d at 64. After the court defines "work" as a matter of law, the fact finder determines "not only how much of plaintiff's time . . . [falls] within the court's definition of 'work' and would be compensable, but also how much of that time was spent with the employers' actual or constructive knowledge." *Holzapfel*, 145 F.3d at 521. If a court determines that the activity at issue constitutes "work", an employee is entitled to compensation for those hours of work performed of which the employer had actual or constructive knowledge. *Id.* at 524. The NYLL "incorporate[s] FLSA standards for determining whether time worked is compensable time." *Hamelin v. Faxton-St. Luke's Healthcare*, 274 F.R.D. 385, 392 (N.D.N.Y. 2011); *see also DeJesus v. HF Mgmt. Servs.*,

726 F.3d 85, 89 n.5 (2d Cir. 2013).

Under 29 C.F.R. § 785.23, "[a]n employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises. Ordinarily, he may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own." It is clear that the time Calderon spent, for example, responding to calls or working in the basement after hours were for his employer's benefit and is compensable. However, Calderon argues that his entire on-call period, from 5:00 p.m. until 8:30 a.m. on weekdays, and all day on the weekends, is also compensable, regardless of whether he was actually performing work. The question then becomes whether Calderon was "engaged to wait" or "waiting to be engaged." "The '[f]acts may show that the employee was engaged to wait,' making the time compensable, or that the employee instead 'waited to be engaged,' rendering the time not compensable." *Moon v. Kwon*, 248 F. Supp. 2d 201, 229 (S.D.N.Y. 2002) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 137 (1944)). When periods of inactivity are "unpredictable . . . [and] usually of short duration," and the employee "is unable to use the time effectively for his own purposes", then the employee is "engaged to wait," and the inactive time constitutes "work" time under the FLSA or NYLL—even if "the employee is allowed to leave the premises or the job site during such periods of inactivity." 29 C.F.R. § 785.15. On the other hand, when an employee "is not required to remain on the employer's premises but is merely required to leave word at his home or with company officials where he may be reached," then the employee is "waiting to be engaged," and therefore not "work[ing]" under FLSA or NYLL during that inactive time. 29 C.F.R. § 785.17.

The Court concludes that a jury could find that Calderon's on-call hours from 5:00 p.m. to

10:00 p.m. during the weekdays and from 8:30 a.m. to 10:00 p.m. on Saturdays are potentially compensable, but not his Sunday on-call hours or his on-call hours between 10:00 p.m. and 8:30 a.m. (except, as noted, for any work that he actually performed). This is because Calderon alleges that his "waiting time" before 10:00 p.m. "was of a different nature than his waiting time [after 10:00 p.m.]—his work [before 10:00 p.m.] was [allegedly] much more frequent . . . and the periods of inactivity [before 10:00 p.m.] were [allegedly] considerably shorter, making it far more difficult for him to 'to use the time effectively for his own purposes.'" *Moon*, 248 F. Supp. 2d at 230-31 (quoting 29 U.S.C. § 785.15); (*see also* Calderon Dep., 197:3-15, 199:22-200:19.) By contrast, after 10:00 p.m., Calderon admits that he was free to leave the building, free to engage in personal activities, and "wasn't working" unless called. (Calderon Dep., 146:17-19, 197:12-15, 199:22-200:19); *see also Moon*, 248 F. Supp. 2d at 230 ("The fact that [plaintiff] was present in the [building] during the periods of inactivity in between his night-time calls does not mean that he was 'on duty' during those intervals, since as the Court already has found, the [building] was [Plaintiff's] *home* during . . . the period in question. It necessarily follows that except when called upon to perform lengthy night-time tasks . . . the time [plaintiff] spent in the [building] was not time spent primarily for the benefit of the employer and his business.") (citation omitted); 29 C.F.R § 778.223; *cf. Perkins v. Bronx Lebanon Hosp. Ctr.*, 715 F. App'x 103, 104 (2d Cir. 2018).

In addition, on Saturdays from 8:30 a.m. to 10:00 p.m., Calderon was allegedly also not allowed to leave the premises, which weighs in favor of finding his time potentially compensable, even though he was not assigned, and does not appear to have done, any work. *See* 29 C.F.R. § 785.17 ("An employee who is required to remain on call on the employer's premises or so close thereto that he cannot use the time effectively for his own purposes is working while 'on call.'");

*see Redzepagic v. Hammer,* No. 14-CV-9808 (ER), 2017 WL 780809, at *8 (S.D.N.Y. Feb. 27, 2017) ("While Defendants point to evidence that shows Plaintiff was able to use on-call time for his own purposes—including Plaintiff's deposition testimony that he was able to watch TV, use the computer, go to the gym, and run errands—an issue of material fact remains as to how much time spent on the premises constitutes work in light of any restrictions on Plaintiff's freedom."); *O'Neill v. Mermaid Touring Inc.*, 968 F. Supp. 2d 572, 582 (S.D.N.Y. 2013) ("There is conflicting evidence as to whether Plaintiff was able to use time spent 'on-call' for [his] personal use. This is a fact-specific inquiry best left to the fact finder."). However, on Sundays, Calderon concedes that there were no restrictions on his activities, he was just required to leave someone in charge while he was out. Pursuant to 29 C.F.R § 778.223, "[i]f the employees who are thus on call are not confined to their homes or to any particular place, but may come and go as they please, provided that they leave word where they may be reached, the hours spent 'on call' are not considered as hours worked."

Construing the allegations in the light most favorable to Plaintiff, factual issues exist as to whether Calderon is entitled to payment for his on-call hours: (1) between 5:00 p.m. to 10:00 p.m., Monday to Friday; (2) between 8:30 a.m. to 10:00 p.m. on Saturdays; and (3) any hours he allegedly worked between 10:00 p.m. to 8:30 a.m. However, as discussed *supra*, Calderon would only be entitled to collect liquidated damages and/or prejudgment interest.

**B. Calderon's Termination Date**

Defendants assert that Calderon should be judicially estopped from claiming any damages for unpaid wages after July 22, 2013. (Defs.' Br., at 25-26.) Judicial estoppel "prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by [that party] in a prior legal proceeding." *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1037

(2d Cir. 1993).  The purpose of the doctrine is "to protect the integrity of the judicial process . . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment."  *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (internal quotation marks and citations omitted).  "A party invoking judicial estoppel must show that (1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner, such as by rendering a favorable judgment."  *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999) (internal citations omitted).  However, there is also a "good faith" exception, which provides that judicial estoppel does not apply if the first party statement or position at issue results from a "good faith mistake or an unintentional error."  *Id.* at 6 n.2 (citation omitted).

At his Worker's Compensation Hearing in June 2014, Calderon testified that "July 22[, 2013] was [his] last day" at work.  (Hearing Tr. 5:19-20.)  And in its opinion, the Appeals Board noted, *inter alia*, that "[t]he claimant stopped working on July 22, 2013, due to pain."  (Board Dec., at 2.)  In addition, the termination letter Calderon received from Defendants on November 15, 2013 stated, "Your employment with us officially ended on July 23, 2013.  We have held the position of Superintendent open from July to the present."  (Dkt. 93-12.)  Additionally, during his deposition, Calderon stated:

> Q: And the reason why you didn't say anything [at your disability hearing when your attorney said that your last day of work was July 22, 2013] was because the last day of work for Mr. Mullarkey was July 22nd, 2013, correct?
>
> A: Mm-hmm, yes.
> . . .
>
> Q: And [Mullarkey] said look, if you come do some paperwork for an hour or two each day in the basement [after July 2013], I'm not going to charge you rent, correct?
>
> A: That's what I understood, but it was not explained to me in this manner.

Q: And you agreed to do some paperwork in the basement in exchange for not having to pay rent, and you did that because you didn't want to go out on street yourself or have your family go out on the street, correct?

A: Or to be in the basement.

Q: To be in the basement, correct?

A: Yes.

Q: And that arrangement continued from July, August, September, October and November [of 2013], right?

A: Yes.

Q: And then in November, you got the letter saying you were fired, correct?

A: No, the letter was dated July 14th when he fired me.

(Calderon Dep., 69:21-25, 272:3-24; *see also* Mullarkey Dep., 161:8-13, 162:23-163:6.)

Defendants argue that since Calderon made a prior sworn statement to a government agency (*i.e.*, the New York State Workers' Compensation Board) indicating that his employment ended on July 22, 2013, "he must be judicially estopped from claiming any damages for unpaid wages after that time." (Defs.' Br., at 24-25.)

Plaintiff counters that his current position is not inconsistent with what he stated at his disability hearing. According to Calderon, he "testified that July 22, 2013 was his last day, which is consistent and reconcilable with the fact that Defendants terminated his employment as a full-time Superintendent yet still required him to perform office work from July 23, 2013 through November 15, 2013." (Pls.' Br., at 24; Calderon Dep., 270:8-16.) In fact, the Worker's Compensation Appeals Board noted that Catherine Mullarkey testified at the hearing that Calderon "was terminated on November 15, 2013." (Board Dec., at 3.) Additionally, Calderon testified at his deposition that, from September to November 2013, he would "wr[i]te the hours that [he] worked and [he] did it daily, and those are the hours that [he] stayed in the basement." (Calderon

Dep., 276:25-277:6.) He further stated that he was fired in November 2013 when Mullarkey "noticed that [Calderon] was registering that time that he was forcing me to go downstairs[;] . . . that's when this letter appeared, when this letter appeared where it says that in December, if I didn't pay rent, I would have to move out." (*Id.* at 277:12-21.) At this stage, viewing the evidence in the light most favorable to Calderon, the Court finds that there is a genuine issue of material fact as to whether Defendants can carry their burden to invoke the doctrine of judicial estoppel regarding Calderon's FLSA and NYLL unpaid wage claims for the period from July 22, 2013 to November 15, 2013.[24]

## CONCLUSION

For the reasons stated herein, the Court grants Defendants' initial and supplemental motions for summary judgment as to: (1) Calderon's FLSA minimum wage claim for the period from April 24, 2011 to July 22, 2013; (2) Calderon's NYLL minimum wage claim for the period from April 24, 2008 to July 22, 2013; (3) Calderon's FLSA retaliation claim in its entirety; and (4) Calderon's NYLL retaliation claim in its entirety. The Court denies Defendants summary judgment as to the rest of Plaintiffs' claims. Plaintiffs' motion for summary judgment is denied in its entirety.

---

[24] Defendants also note that in his April 2015 declaration submitted in connection with his summary judgment motion, Calderon stated, "[b]y this lawsuit I am seeking compensation owed to me for the time period between April 1, 2008 and *June 31, 2013*. Throughout this document when I refer to my employment period I am referring only to this time period." (April 2015 Calderon Decl., ¶¶ 3-4 (emphasis added).) According to Plaintiffs, "[w]hile Calderon states that he is affirmatively seeking damages for the period of April 2008 through June 31, 2013, Calderon does not state in the cited declaration that he is *not* seeking damages for the period of July 1, 2013 through November 15, 2013." (Pls.' Br., at 24 n.8.) While this argument strains credulity—not only because June 31, 2013 is not a real date—the Court finds that the declaration is not a sufficient basis on which to grant summary judgment, particularly since the declaration in question states that Calderon was the building superintendent "until November 2013" and only addresses the time frame in which Plaintiff is "claiming twenty-four hours a day[,] seven days a week compensation." (April 2015 Calderon Decl., ¶¶ 3, 11.)

Accordingly, Plaintiffs' claims that will be proceeding to trial are: (1) FLSA unpaid overtime claim; (2) FLSA minimum wage claim (however, Calderon is limited to the period from July 23, 2013 to November 15, 2013); (3) NYLL unpaid overtime; (4) NYLL minimum wage (however, Calderon is limited to the period from July 23, 2013 to November 15, 2013); and (5) NYLL wage statement claim. However, as discussed, Calderon may only recover liquidated damages and/or prejudgment interest for his minimum wage and overtime claims.

SO ORDERED.

/s/Pamela K. Chen_____
Pamela K. Chen
United States District Judge

Dated: June 10, 2018
      Brooklyn, New York